NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE DEPENDENCY AS TO B.U.

No. 1 CA-JV 24-0054

FILED 08-29-2024

Appeal from the Superior Court in Maricopa County
No. JD534217
The Honorable Ashley V. Halvorson, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant Father*

Maricopa County Legal Advocate's Office
By Amanda L. Adams
*Counsel for Appellee B.U.*

Arizona Attorney General's Office, Mesa
By Ingeet P. Pandya
*Counsel for Appellee Arizona Department of Child Safety*

---

## MEMORANDUM DECISION

Judge D. Steven Williams delivered the Court's decision, in which Presiding Judge Michael J. Brown and Judge Daniel J. Kiley joined.

---

**W I L L I A M S**, Judge:

**¶1**        Roger R. ("Father") appeals the juvenile court's dependency order. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**        Father informs he has ten children with three different mothers. None of the children are currently in his care, though he claims he sees at least two of them every other weekend. The youngest child, Brody (a pseudonym), was born substance-exposed to methamphetamine in February 2023. Father was not present for Brody's birth nor was he listed as Brody's father on the birth certificate.

**¶3**        After Mother left the hospital, she never returned for Brody.[1] The Arizona Department of Child Safety ("DCS") placed the infant with a relative and petitioned the juvenile court for a dependency. Because Father's identity was unknown, DCS used "John Doe" as Father's fictitious name. The court found Brody dependent as to both parents.

**¶4**        In June 2023, DCS moved to terminate both parents' rights to Brody based upon abandonment and failure to maintain a normal parent-child relationship. However, in September 2023, DCS learned of Father's identity and contacted him to let him know that he may be Brody's father. DCS asked Father to submit to a rule-out urinalysis ("UA") and hair follicle testing (for drugs), but Father refused until he received the results of a paternity test. That paternity test confirmed Father was Brody's biological parent. Based upon its discovery of Father's identity, DCS withdrew its motion to terminate Father's parental rights and the court changed the case plan to family reunification.

**¶5**        In October 2023, DCS filed an amended dependency petition with Father's information. The petition alleged that Brody was dependent because Father had "neglected his child" and was "unable or unwilling to

---

[1]        Mother is not a party to this appeal.

provide proper and effective parental care" given that "Father ha[d] not maintained a normal parent[]child relationship with the child since the date of the child's birth."

¶6        After paternity was established, Father continually refused to complete any UA or hair follicle testing despite (1) the juvenile court ordering that he do so, and (2) DCS following up time and again. DCS also referred Father to the Nurturing Parenting Program ("NPP") to determine whether "he had the appropriate tools and knowledge to be able to properly care for [Brody]" because it was unclear to what extent Father had parented his other nine children. Father participated in some supervised visits with Brody but refused to complete NPP.

¶7        On the morning of the February 2024 dependency adjudication hearing, Father, for the first time, submitted to a UA. But the results were not available for the hearing and are not included in the appellate record. In any event, during the hearing, Father testified that he was willing to do whatever was required to gain custody of Brody so long as drug testing was limited to UAs. Father professed that undergoing a hair follicle or cuticle test would "go against [his] religion." He later modified his testimony, stating that his unwillingness to undergo a cuticle test was "not really a religious thing," but instead resulted from his grooming habits. "I don't have fingernails," he stated, "because as a cook and a chef, I'm straight cleaned and groomed and cut down to the skin."

¶8        Father also testified that he was willing to participate in NPP despite previously refusing to and informing DCS of that refusal. He further testified that he lived with his mother and stepfather and that his mother would be able to help him raise Brody. As for DCS's part, the case manager maintained that Brody would be at risk if placed in Father's care given, in part, Father's refusal to engage in services. After taking the matter under advisement, the court found Brody dependent.

¶9        Father timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution, A.R.S. §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1), and Arizona Rule of Procedure for the Juvenile Court 601(a).

## DISCUSSION

¶10       Father argues there was no basis for the juvenile court's finding that he was "incapable of caring for [Brody] or that [Brody] was at risk with Father." He also claims there was no reason to believe that Father had substance-abuse issues that interfered with his ability to parent the child.

**¶11**         We review a dependency finding for an abuse of discretion, *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 488, ¶ 12 (App. 2015), viewing the evidence in the light most favorable to sustaining the juvenile court's findings. *Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 235, ¶ 21 (App. 2005). Because the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004), we affirm its findings unless the record has no reasonable evidence to support them. *Willie G.*, 211 Ariz. at 235, ¶ 21.

**¶12**         The juvenile court must make its dependency determination "based upon the circumstances existing at the time of the adjudication hearing." *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 50, ¶ 12 (App. 2016). The court may, however, consider prior events if they pose a "substantia[l] and unresolved threat" to the child. *Id.* at 51, ¶ 16. DCS has the burden of proving the allegations of a dependency petition by a preponderance of the evidence. *See* A.R.S. § 8-844(C)(1).

**¶13**         A dependent child is one adjudicated to be:

> (i)     In need of proper and effective parental care and control and who has no parent . . . willing to exercise or capable of exercising such care and control.

A.R.S. § 8-201(15)(a)(i). One basis upon which the court may adjudicate a child dependent is neglect—which is the only ground alleged by DCS here. A.R.S. § 8-201(15)(a)(iii). Neglect includes "[t]he inability or unwillingness of a parent . . . to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes substantial risk of harm to the child's health or welfare . . ." A.R.S. § 8-201(25)(a).

**¶14**         The juvenile court found Brody dependent based upon neglect given Father's "refusal to complete the safety assessment and participate in the requested services." The court further found that "Father's refusal to complete the safety assessment and participate in the requested services amount[ed] to an inability or unwillingness to provide proper and effective parental care and control . . . [which] pose[s] a substantiated and unresolved threat to the child." Reasonable record evidence supports the court's findings.

**¶15**         As stated, *supra* ¶2, Father has ten children. It is unclear from the record how involved Father has been in actively parenting any of them, though there is some indication in DCS reports that Father's involvement has been, and is now, limited. Father does not currently have any child

living with him. Consequently, the juvenile court's concern with Father's refusal to complete NPP as recommended by DCS—which was intended to evaluate Father's ability to safely parent Brody—was reasonable and within its discretion in concluding that Father was unwilling and/or unable to provide proper and effective parental care of Brody.

¶16　　　　And though Father takes issue with the juvenile court (and DCS) requiring his participation in rule-out drug testing before placing Brody (now nearly one-and-a-half years old) in Father's care for the first time, we cannot say the court's rationale was unreasonable. The court explained that "demonstrating sobriety is a reasonable and necessary part of the safety assessment in this case, especially [since Brody was] born substance exposed, Father's relationship with Mother who is known to have a severe substance abuse history, and prior DCS concerns of substance abuse." *See Campbell v. Superior Court*, 106 Ariz. 542, 547–48 n.3 (1971) ("[I]t is reasonable to infer that a refusal to take [a substance] test indicates the defendant's fear of the results of the test and his consciousness of guilt.") (quoting *City of Westerville v. Cunningham*, 239 N.E.2d 40, 41 (Ohio 1968)).

¶17　　　　By refusing participation in NPP and refusing to submit to rule-out drug testing, Father precluded DCS from completing its safety assessment to determine whether he could safely parent Brody. The juvenile court's dependency order, based upon Father's refusals, was within the court's discretion and supported by reasonable record evidence.

## CONCLUSION

¶18　　　　For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:　AGFV